IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TITO JAY RISNER, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 3:19-cv-03078-N (BT) |
| | § | |
| GARY FOWLER, et al., | § | |
| Respondents. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Petitioner Tito Jay Risner filed this habeas corpus proceeding under 28 U.S.C. § 2241, challenging a November 18, 2019 Order finding him extraditable to Colombia. Pet. (ECF No. 1); *see In re Extradition of Tito Jay Risner a/k/a Jay Michael Risner a/k/a Tito*, No. 3:18-mj-765-BN, Mem. Op. & Order (ECF No. 76) (N.D. Tex. Nov. 18, 2019) (the "Extradition Case"). For the following reasons, the Court should DENY the petition.

I.

Risner moved to the United States from the Republic of Colombia in 1968 and became a naturalized citizen in 1975. In 1990, Risner traveled with his wife and family to Cartagena, Colombia. His wife was murdered there on July 4, 1990. More than four years later, Risner was convicted in Colombia *in absentia* of aggravated homicide and sentenced to twenty years' confinement. His conviction and sentence were affirmed, also *in absentia*, in 1998. Colombia subsequently requested Risner's extradition, and on November 16, 2018, the United States filed

a Complaint on Colombia's behalf requesting the extradition. Risner was arrested in Dallas, Texas, on November 16, 2018, and he has been in federal custody since his arrest.

On November 18, 2019, a United States magistrate judge in this District (the "Extradition Court") issued a Memorandum Opinion and Order, finding that Risner may be extradited to Colombia for the offense of aggravated homicide. *Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order (ECF No. 76). On December 3, 2019, the Extradition Court issued a Certification of Extradition and Order of Commitment pursuant to 18 U.S.C. § 3184, certifying the matter for the Secretary of State's consideration under 18 U.S.C. § 3186, and committing Risner "to the custody of the United States Marshal" pending the Secretary's decision on extradition. *Risner*, No. 3:18-mj-765-BN, Extradition Cert. (ECF No. 78).

On December 31, 2019, Risner filed this petition challenging the Certification of Extradition and Order of Commitment. Risner argues: (1) "the Extradition Court erred when it concluded it had jurisdiction over the matter pursuant to 18 U.S.C. § 3184 even though the extradition request was made pursuant to domestic Colombian law"; (2) "the Extradition Court erred when it concluded it had jurisdiction over the matter pursuant to 18 U.S.C. § 3184 because a valid Treaty was in full force and effect"; and (3) "the Extradition Court erred when it concluded that the *in absentia* conviction established probable cause and rejected the evidence offered by Petitioner." Pet. 11-12. On March 15, 2020, the

government filed its response to the petition. Resp. (ECF No. 7). On May 6, 2020, Risner filed a reply, and on May 10, 2020, he filed an amended reply. Reply (ECF No. 17); Am. Reply (ECF No. 18-1). The petition is fully-briefed and ripe for determination.

## II.

"Habeas corpus review of the findings of a court which conducted an extradition hearing is extremely limited." *Garcia-Guillern v. United States*, 450 F.2d 1189, 1191 (5th Cir. 1971). The review is limited to a determination of (1) whether the extradition judge had jurisdiction, (2) whether the offense charged is "within" the applicable treaty, and (3) whether there was "any evidence" warranting the judge's finding that reasonable grounds exist to believe the fugitive is guilty. *See Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (Holmes, J.) (citations omitted); *see also Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir. 1980) (citations omitted) (same); *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1163 (11th Cir. 2005) (citation omitted) (same). The petitioner bears the burden to show by a preponderance of evidence that he is held contrary to the Constitution, law, or the treaties of the United States. *See Skaftouros v. United States,* 667 F.3d 144, 158 (2d Cir. 2011) (citing *Parke v. Raley*, 506 U.S. 20, 31 (1992); *Walker v. Johnston*, 312 U.S. 275, 286 (1941)).

1.    <u>Risner fails to show the Extradition Court erred when it determined the extradition request was made pursuant to the Treaty.</u>

Risner argues the Extradition Court lacked jurisdiction because Colombia's Diplomatic Note requesting extradition cites article 569 of the Colombian Criminal Procedure Code,[1] and, therefore, Colombia requested extradition pursuant to Colombian domestic law and not the Treaty of Extradition Between the United States of America and the Republic of Colombia, signed at Washington on September 14, 1979 (the "Treaty"). Treaty of Extradition Between the United States of America and the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8.[2] Specifically, Risner states:

> Colombia's request to extradite Petitioner was made pursuant to domestic Colombian law and *not* pursuant to the un-ratified treaty between the United States and Colombia. . . . [T]he Extradition Court does not have jurisdiction to certify the matter for extradition in the absence of a request made pursuant to a valid Treaty. . . . Colombia's extradition request of Petitioner was made pursuant to "article 569 of the Colombian Criminal Procedure Code." Article 569 of the Colombian Criminal Procedural Code did not provide the Extradition Court with authority to certify this matter for extradition. There is no mention of a treaty, unratified or otherwise, in the extradition request.

Pet. 6-7 (emphasis in original).

The government responds that Colombia relied on the Treaty for its extradition request and that the Diplomatic Note citing article 569 of the Colombia

---

1 *Risner*, No. 3:18-mj-765-BN, The Diplomatic Note (ECF No. 1-1 at 4).
2 *Risner*, No. 3:18-mj-765-BN, The Treaty (ECF No. 1-1 at 194).

Code of Criminal Procedure "merely recites that Colombia's Diplomatic Mission is forwarding a list of documents comprising the record, which Colombia's Ministry of Justice submitted 'accrediting compliance with the conditions to formalize an extradition application, as set out in [Colombian law].'" Resp. 28 n.13 (brackets in original).

The Extradition Court rejected Risner's argument. The Court noted "Mr. Risner's counsel acknowledges that she has been unable to locate a case analyzing this challenge to an extradition request." *Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order 18. The Court further explained why it was not persuaded by Risner's arguments: "The record here supports that Colombia sought his extradition pursuant to the Treaty. And neither the Treaty, Section 3184, nor case law supports Mr. Risner's contention that Colombia's diplomatic note must expressly mention the Treaty." *Id.* 19.

Once again, Risner has cited no authority supporting his assertion that Colombia was required to cite or mention the Treaty in its extradition request, and he makes no other argument in support of his claim that Colombia sought extradition pursuant to its domestic law rather than the Treaty. He has failed to show the Extradition Court erred as to this claim.

2.    Risner fails to show the Extradition Court erred in finding the Treaty valid.

Risner argues the Extradition Court lacked jurisdiction because there was no valid Treaty in force, and the Extradition Court "abdicated its judicial authority

5

to the State Department in concluding that a valid Treaty existed." Pet. 11-12. He argues the Colombian Supreme Court twice ruled the Treaty was not valid and that "several high-ranking current representatives and former leaders of Colombia have repeatedly stated there is no extradition treaty between the United States and Colombia." *Id.* 7.

Risner also raised these claims in the Extradition Court. In response, the Court explained:

> The United States Court of Appeals for the Eleventh Circuit recently addressed this issue and determined that "the Treaty remains in effect." *Arias Leiva v. Warden*, 928 F.3d 1281, 1288 (11th Cir. 2019). The Court is persuaded by and adopts the Eleventh Circuit panel's thorough reasoning, which addresses and rejects most of the arguments that Mr. Risner raises here regarding the Treaty's validity, as further supported by Government's Exhibit Nos. 3 and 4, the declarations of Tom Heinemann of the U.S. Department of State. *See id.* at 1286-92.
>
> Mr. Risner urges the Court not to do so because, he argues, the *Arias* panel entirely ignored in the opinion the dicta in three Eleventh Circuit opinions, completely ignored two opinions from the Colombian Supreme Court, and completely ignored the voices of both Colombian and United States leaders, including Uribe, Santos, Lambaño, and Senator Rubio, all saying the United States and Colombia do not have a valid treaty. But the Eleventh Circuit's decision did address those matters, as the government's reply persuasively explains, *see* Dkt. No. 70 at 1-8, and the Court is persuaded by and will follow the Eleventh Circuit panel's analysis.
>
> * * *
>
> As for Mr. Risner's argument that Colombia's request is prohibited pursuant to Colombian law, the Court will

defer to the requesting nation's interpretation of its own law and will not purport to invalidate Colombia's official request for extradition based on the internal laws of Colombia that Mr. Risner in another argument asserts that the Court cannot exercise or act under. And, because there is a ratified treaty in place between the United States and Colombia, the government need not rely on the theory of reciprocity as the basis for the extradition request. But, even if the Court were required to do so, Mr. Risner's pointing to news articles on a number of requests rejected by Colombia does not establish a lack of reciprocity in the face of the evidence that "Colombia routinely acts on U.S. extraditions and, in fact, consistently extradites more fugitives annually to the United States than any other country." Gov't Ex. 4 at ¶ 9.

The Court determines, as did the Eleventh Circuit in recent months, that there is a valid, ratified extradition treaty in effect between the United States and Colombia.

*Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order 21-22.

The petitioner in *Arias*, like Risner, argued that the United States could not extradite him to Colombia because the Treaty was not valid and in effect. The Eleventh Circuit stated:

Arias is right that, in 1986, the Colombian Supreme Court nullified the domestic legislation that ratified the treaty and that as a result Colombia no longer relies on the treaty when sending fugitives to the United States. But the frailty in his argument is that our Executive Branch—not Arias and not this Court—gets to decide what impact, if any, the Colombian court's ruling had on the treaty's status as between the parties. And, according to the Department of State, both countries continue to recognize the compact as valid and in force. Under the separation of powers established in and demanded by our Constitution, the Judicial Branch cannot second-guess that political judgment call or indulge whatever our own views on the matter may be.

7

*****

> And as we have specifically recognized, courts "*must* defer to the determination of the executive branch" in deciding whether an extradition treaty remains in force. *Meza [v. U.S. Att'y Gen.]*, 693 F.3d [1350,] 1358 [(11th Cir. 2012)] (emphasis added). In keeping with that conclusion, we held in *Meza* that the extradition treaty between the United States and Honduras remained valid because "a member of the executive branch attested" to that effect. *Id.* Here too, Mr. Heinemann's declaration set forth the United States Executive Branch's position—that the Treaty remains in full force.

*****

> Arias, however, seems to reason that the 1986 ruling retroactively cancelled the effect of that ratification and exchange between the parties. But both signatories continue to officially recognize the Treaty—notwithstanding the Colombian Supreme Court's ruling that the Colombian official who ratified the Treaty lacked the power to act in that capacity. *Cf. [Doe v.] Braden*, 57 U.S. [635,] 657 [(1853)] (declining to second guess the Executive's judgment that "the person who ratified the treaty on behalf of a foreign nation had the power, by its constitution and laws, to make the engagements into which he entered"). In fact, although both Colombia and the United States remain free to terminate the Treaty "at any time by giving notice to the other Party," neither nation has ever done so. Extradition Treaty, Colom.-U.S., *supra*, art. 21, S. Treaty Doc. No. 97-8, at 8.

*Arias*, 928 F.3d at 1283-84, 1288.

Further, as to Risner's argument that, "the Extradition Court cannot wholeheartedly rely on declarations from the State Department because of the three coequal branches of government," Pet. 8, the Executive branch has the

8

authority to determine whether a treaty remains in force. As stated by the *Arias* court,

> Given these understandings about the division of authority and expertise between the executive and judicial branches, we must be careful to "observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other." *Franklin Mint Corp. v. Trans World Airlines, Inc.*, 690 F.2d 303, 311 (2d Cir. 1982). On matters of construction, courts have the final word; the views of the Executive, while important, are "not conclusive." *Factor v. Laubenheimer*, 290 U.S. 276, 295 . . . (1933). On matters of recognition, by contrast, we defer to the Executive's authority to make treaties and conduct our foreign affairs. (citations omitted).

*Arias*, 928 F.3d at 1289. This Court also finds the *Arias* decision persuasive. Further, Risner has cited no court decision finding the Treaty invalid or not in force. He has failed to show that the Extradition Court erred in finding that it had jurisdiction under the Treaty.

3. <u>Risner fails to show the Extradition Court erred when it found probable cause.</u>

Risner argues the "Extradition Court erred when it concluded that the *in absentia* conviction established probable cause and rejected the evidence offered by Petitioner." Pet. 12.

In reviewing the Extradition Court's determination of probable cause, the Court's "function is to determine whether there is any competent evidence tending to show probable cause. The weight and sufficiency of that evidence is

for the determination of the committing court." *Escobedo*, 623 F.2d at 1101 (citations and internal quotation marks omitted).

Risner argues that the mere fact of his conviction in Colombia cannot support a probable cause finding. But here, the Extradition Court did not simply rely on Risner's *in absentia* conviction to find probable cause. Although the Court stated that, "Article 9 of the Treaty does not require evidence to show probable cause, only requiring a copy of the judgment of conviction imposed by a court of the Requesting State; evidence proving that the person sought is the person to whom the conviction refers; and a copy of the sentence imposed and a statement showing to what extent the sentence has not been carried out," *Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order 23 (internal quotation marks and brackets omitted), the Court also considered a summary of evidence from the Colombian courts submitted by the government. This summary provided:

> [o]n December 9, 1994, the Colombian Criminal Court Six, Circuit of Cartagena, convicted Risner of the aggravated homicide of his wife, Patricia Gomez de Risner (the "victim" or "Risner's wife"), in violation of Article 324 of Colombia's Criminal Code, and sentenced him to twenty years imprisonment. (*See, e.g.,* Dkt. No. 1-1 at Page ID 163-64.) The conviction was twice affirmed on appeal, first by the Superior Tribunal of the Judicial District of Cartagena on April 20, 1995, and then by the Supreme Court of Justice, Criminal Cassation Division, on November 23, 1998. The extradition request [Dkt. No. 1-1] from the Government of Colombia includes all of these court decisions, which reflect the following:

The victim was born in Colombia and lived in Texas. (*See id.* at Page ID 167.) In early July, 1990, the victim and Risner were visiting Cartagena, Colombia, and staying at the Hotel Bellavista. On July 4, 1990, the victim was shot fatally in the head while walking outside a building with her mother in Cartagena. (*Id.* at Page ID 149, 154, 181.)

Colombian police officers arrested Raul Alberto Ramirez Montoya ("Ramirez Montoya") and Yolanda Zuluaga Velez ("Zuluaga Velez") at the scene. The two were implicated in the homicide through questioning and were convicted of the murder. (*Id.* at Page ID 149, 167, 181.)

Hotel and other records reflected that three days before the murder, Risner's co-defendant and relative, Jairo Hernandez Pachon ("Hernandez Pachon"), together with companions Ramirez Montoya and Zuluaga Velez, checked into the hotel room adjacent to the one the Risners occupied at Hotel Bellavista. (*See id.* at Page ID 156–57, 160, 177.) Hernandez Pachon paid the bill for himself, Ramirez Montoya, and Zuluaga Velez. (*Id.* at Page ID 160, 177, 182.) Given their proximity to the victim while she was a guest at the hotel, Ramirez Montoya and Zuluaga Velez had opportunities to become aware of the victim's identity and appearance. (*See id.* at Page ID 177.) Further, a Colombian police agent testified that he had obtained confidential information that when Risner and the victim were walking on the beach, Risner "made signs" to hire Hernandez Pachon and his companions. (*Id.* at Page ID 153.)

The Colombian court was aware that Risner was the beneficiary of five policies insuring the victim's life for a total value of approximately USD $1.73 million in the 1990s. (*See id.* at Page ID 152.) Some, if not all, of the insurance companies investigated the victim's death and had declined to pay the proceeds to Risner, prompting him to sue them in the United States District Court for the Northern District of Texas. *See id.* at Page ID 155,

190; *Risner v. Amex Life Assur. Co.*, No. Civ. A No. 3-91-1646, 1993 WL 55957, at *1 (N.D. Tex. Jan. 19, 1993) (noting that Tito Risner was the designated beneficiary of several insurance policies on the victim's life, on which he tried to collect). The Colombian court had before it the complete report of an investigation that five of the insurance companies had commissioned through private detectives into links between Risner and the victim's murder. (*See* Dkt. No. 1-1 at Page ID 155-56, 183, 190.) The Colombian court also was aware that the aforementioned federal litigation concerning the life insurance proceeds was about to be settled, with the vast majority (according to the extradition request, 85 percent) not to be awarded to Risner and, instead, to be placed in trust for the minor children of Risner and the victim. (*See* Dkt. No. 1-1 at Page ID 155, 190.) The Colombian court, at trial and on appeal, found that Risner, with himself as the beneficiary, had purchased an abnormal number of policies on the victim's life, in an abnormal amount, considering that the victim worked as a nurse and was not exposed to sufficient risk to justify such coverage. (*See id.* at Page ID 156, 170, 176–77.) The policies also exceeded the couple's economic capacity. (*See id.* at Page ID 176–77.)

According to the victim's sister, during the afternoon of the shooting, Risner continuously passed from one side to the other of the windows, from which he could see the street and watch the shooting occur. (*See id.* at Page ID 186.)

Following the murder, Colombian law enforcement interviewed Risner, who seemed defensive and told them he did not know why they were taking his statement. (*See id.* at Page ID 152–53, 174, 182.) Crediting testimony from a police agent who testified based on fifteen years of professional experience and his personal observations of Risner during the interview, the court found that Risner exhibited a strange and cunning attitude at the interview,

rather than an interest in understanding why the victim had been killed. (*See id.* at Page ID 153.)

According to the victim's family, Risner told them that they should do nothing with regard to the investigation because there would be no point to it. (*See id.* at Page ID 175; *see also id.* at Page ID 192 (stating that the lower courts considered that Risner "recommended to the family of the victim that they should not carry out any investigation into events, and should not contract a lawyer for that purpose"). In sum, the court found that Risner's "conduct was totally indolent, avoiding any investigation." (*Id.* at Page ID 153.)

Risner departed Colombia on July 6, 1990, the day after the victim's burial. (*See id.* at Page ID 152–53.)

Ramirez Montoya, who ultimately was convicted of the murder, made statements to police in an effort to prove his own innocence. In these statements, he asserted that the police wrongly had inculpated him in the shooting. Ramirez Montoya invoked the victim's husband in his own defense, and described what the victim's husband was wearing, even though Risner was not on the scene during the shooting or immediately thereafter when police apprehended Ramirez Montoya and removed Ramirez Montoya to a police post. The Colombian court determined that a prior familiarity and criminal link therefore must have existed between Ramirez Montoya and Risner; otherwise, Ramirez Montoya would not have known who the victim's husband was or what he was wearing, and would not have believed it useful to mention an absent stranger in an effort to exculpate himself. (*See id.* at Page ID 154, 176.)

According to the victim's family, although Risner had told the victim that he was a bachelor Spaniard named Tito Jay Risner, they discovered after the victim's murder that, in fact, he was a previously married Colombian named Jose Tito Rodriguez Calderon. In April 1993, the victim's sister reported to Colombian law enforcement,

13

based on information she had received from the fugitive's sister's husband, that Rodriguez Calderon had changed his name to Risner upon moving to the United States. (*See id.* at Page ID 149.) Colombian law enforcement determined, from Colombian civil records including a photographic identity card, that Risner was, in fact, born in Colombia on February 6, 1944, as Jose Tito Rodriguez Calderon (and was listed in records from 1965 as married to a woman named Fronny Avillan, to whom the Colombian court alternately refers as Fronny Saito). (*See id.* at Page ID 149–50, 152.) The Colombian court found, based on testimony from the victim's family, that the victim was unaware of Risner's double identity despite being married to him and having two children with him, that Risner had deceived the victim about his identity, and that this deception indicated that Risner had mounted a plot against the victim. (*Id.* at Page ID 157–58, 178, 186.)

While Risner chose to be physically absent from the Colombian court proceedings against him, the Colombian trial court received and admitted two power-of-attorney forms from him, and counsel represented Risner at trial and on two appeals. A Colombian appellate court expressly rejected Risner's assertion that he had been deprived of a proper defense through counsel. (*See id.* at Page ID 168, 171–73.) Specifically, the Superior Tribunal of the Judicial District of Cartagena recounts the following history in its appellate decision dated April 20, 1995: On December 12, 1991, Risner was summoned for interrogation, but the questioning never occurred because he could not be found. On April 22, 1992, the Colombian court received a power of attorney form from Risner, naming attorney Barreto-Triana from Houston to act as his defense counsel. (*Id.* at Page ID 171.) Barreto-Triana produced a submission stating that Risner was willing to cooperate with the investigation. (*Id.*) The court admitted the power of attorney and scheduled a date of interrogation for May 27, 1992. (*Id.*) Risner failed

to appear on that date, was summoned through his attorney, and again failed to appear. (*Id.*) Risner was implicated via open summons and was declared accused in his absence. (*Id.*) The court appointed attorney Galarza-Dean as *ex officio* counsel to represent Risner. (*Id.*) Galarza-Dean was sworn in and subsequently requested a copy of all documents on file, which copies were ordered. (*Id.* at Page ID 171-72.) When the Prosecution Service decided to close investigations, Galarza-Dean took personal notification of the decision. (*Id.* at Page ID 172.) Once the minutes of the evidence had been assessed, Galarza-Dean took personal notification of the resolution of indictment and appealed against the same. (*Id.*) When trial began, Galarza-Dean requested evidence, including the testimony in public hearing for counter-interrogation and demonstration of Risner's innocence, as appears in his objection in the record; these items were ordered and taken into the files. (*Id.*) At this point, Attorney Barreto-Triana re-appeared and requested to be admitted, asserting that the Prosecution Service or the examining magistrate had, through "involuntary error," not admitted him, and asking that the court admit him and swear him in because his place of litigation was Bogota, and trips to Cartagena would involve substantial expense. (*Id.*) The next day, the court resolved to maintain Galarza Dean as ex officio counsel. (*Id.*) A new power of attorney form from Risner was presented to the court, naming attorney Hernandez Ayazo as principal counsel and Barreto-Triana as his deputy, and *ex-officio* counsel Galarza-Dean was displaced. (*Id.*) The next procedural step was the public hearing, at which Hernandez Ayazo, Risner's counsel of choice, represented Risner. (*Id.*) Among other things, Hernandez Ayazo argued before the trial court for acquittal. (*See id.* at Page ID 148.) At no time did counsel assert any violation of Risner's rights of defense. (*Id.* at Page ID 172) The Colombian appeals court found, based on the record, that "at no time has the technical defense of TITO RISNER suffered any impairment." (*Id.*) Rather:

15

In effect, when [Risner] granted the power of attorney to [Barreto-Triana], he had not become the subject of criminal process, precisely because there was a simple imputation against him, attributing him with a participation in a punishable deed, and therefore the examining magistrate admitted him, but in order for him to initiate his functions in the interrogation of RISNER, since it is by virtue of implication through interrogation that RISNER would become a subject of process .... It should be noted that it is from the time of implication in process through interrogation or declaration of accusation in absence that the suspect becomes an accused, or subject of process, and if this situation is not present, then a defense cannot intervene except to request engagement in the process.

[Risner], despite having stated on several occasions a date on which he would make a statement, did not appear, and this refusal caused him to be engaged or implicated by public summons and a declaration of absence, as noted. And it caused the appointment of an ex officio defense counsel resident in the city, who rapidly was sworn in, and performed his functions step by step, and if he did not take the case to appeal, this cannot be seen as a lack of defense, or deficient defense, since it is known that on occasions silence is precisely the best means of defense. The ex officio defense counsel was consciensous [sic], and personally undertook to receive notice of decisions, and request evidence. And it cannot be said that the assistance of the person subsequently appointed counsel could have changed the course of the process. It should be noted that in the hearing, the defense counsel for RISNER, refrained from interrogating [the] sister of the deceased, who accompanied him [sic] on the day of the events, and in relation to [the victim's] mother, he limited himself to subjects such as her relation with [Risner], how he had known [the victim], the amount of the insurance. But he never questioned her regarding the murder, although

[she] was with her when she received the fatal shot. Nor
did the defense counsel engaged by RISNER complained
[sic] that his client had been barely advised, or that the
supply of one or another piece of evidence would have
changed his situation in the process.

This allowed the conclusion that the rights to defense of
[Risner] in this case have been preserved in their
entirety. That he had technical assistance from the time
of his implication in the process. And that if he did not
exercise that right materially, it was not the lack of
opportunity to do so, but due to his attitude. Risner was
represented by adequate defense counsel throughout the
process and was given full opportunity to present a
defense. (*Id.* at Page ID 172–73.)

*Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order 28-32.

After considering this summary of evidence, the Extradition Court
determined the evidence established probable cause. *Id.* 33. Extradition courts
may properly consider court documents from the requesting country in their
analysis of probable cause. *See Haxhiaj v. Hackman*, 528 F.3d 282, 290-91, 292
(4th Cir. 2008) (concluding "that the evidentiary summary contained within the
opinion of the Court of Appeal of Milan is within the scope of evidence that the
extradition court may consider in making its limited preliminary decision under
§ 3184."); *Nagy v. United States*, 2018 WL 3999683, at *5 (N.D. Ohio June 19,
2018) ("Other courts have reached similar conclusions, relying upon underlying
court documents to establish probable cause. . . . Thus, given the evidence outlined
above from the Romanian court documents, the undersigned recommends the
court find the extradition court's probable cause conclusion – that there was

probable cause. . . – supported. Given the case law cited above, this is so even though the evidence relied upon was in the form of court documents from Petitioner's *in absentia* conviction." (collecting cases)); *In re Extradition of Camelo-Grillo*, 2017 WL 2945715, at *8 (C.D. Cal. July 10, 2017) (concerning an *in absentia* conviction for murder in Colombia, "[t]he Court adopts the approach taken by the Fourth Circuit in *Haxhiaj* and other courts, in which an *in absentia* conviction, supported by the court's summary of the evidence presented, may provide probable cause." (citing *Haxhiaj*, 528 F.3d at 289)).

Risner argues, however, that the Extradition Court improperly rejected the evidence he submitted to negate probable cause. He states his private investigator, Lisa Ruth, testified at the Extradition Court's evidentiary hearing that her investigation had determined that Guillermo Pinzon, the husband of the decedent's sister, "heavily influenced and tainted the integrity of the both the criminal investigation and the insurance investigation against Petitioner." Pet. 10. According to Ruth, probable cause had not been established because other evidence showed:

- Pinzon was a military official with a lot of influence over local police;

- Pinzon was the sworn enemy of Petitioner because Pinzon physically abused Petitioner's sister Carmelita and Petitioner put a stop to that;

- Pinzon influenced Patricia's family and told them false information about Petitioner;

- Gloria Gomez, the sister of the deceased, said she did not say that Petitioner paced in front of the window so he could see the crime occur on the street;

- The El Laguito building has no windows on the front from where the street is visible;

- Petitioner and his family stayed at the family apartment at El Laguito, not the Bellavista Hotel;

- Petitioner was never married to Fronny Avillan and did not assume a false identity;

- The shooters had never met or even seen Petitioner; and

- The shooters were tortured in an effort to implicate Petitioner.

*Id.* In addition to this testimony, Risner presented three declarations from Ms. Ruth and a legal opinion by David Morales, a Colombian criminal attorney. *Id.* In his briefing to the Extradition Court, he also submitted explanatory evidence relating to the purchase of the insurance policies. *Id.* Risner stated that his counsel in Colombia had been declared a fraud and had been disciplined for unethical conduct, leaving him "entirely unrepresented." *Id.* 9.

In this case, Risner claims in his reply brief that there is no evidence the life insurance was a motive for the murder, and he again argues:

> [T]he issues regarding Guillermo Pinzon and his acrimonious relationship with Risner have been well-documented. There is evidence that the statement made by the shooter was obtained by torture. . . There was evidence that critical witnesses recanted their prior testimony. . . [A] critical issue the Government argued is that the conviction *in absentia* relied on evidence that the

family stayed next to the killers at Hotel Bellavista. This is provably false. . . This evidence must be considered by this Court in its determination whether probable cause exists to believe that Risner had Patricia killed.

Reply at 8-9 (ECF No. 18-1).

"The right of a respondent to present evidence in an extradition proceeding is limited." *In re Extradition of Bonilla*, 2014 WL 934903 at *9 (E.D. Tex. Mar. 4, 2014). But "[e]xplanatory evidence which clarifies inherently suspect and uncorroborated evidence may be admitted and considered, especially when it completely negates all basis for probable cause." *Id.* (citing *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 734, 741 (W.D. La. 1999); *In re Extradition of Contreras*, 800 F. Supp. 1462, 1464, 1469 (S.D. Tex. 1992)). As the Third Circuit has stated:

> The range of evidence that a defendant may introduce as to probable cause at an extradition hearing is limited. Courts have traditionally distinguished between inadmissible "contradictory evidence," which merely conflicts with the government's evidence, and admissible "explanatory evidence," which entirely eliminates probable cause. *See, e.g., Barapind v. Enomoto*, 360 F.3d 1061, 1069 (9th Cir. 2004) ("The general rule is that evidence that explains away or completely obliterates probable cause is admissible, while evidence that merely controverts the existence of probable cause is not.") (internal quotation marks omitted); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) ("Although it is within the discretion of the district court to permit the relator to offer limited, explanatory evidence relating to the charges against him, contradictory evidence properly may be excluded.") (citations omitted). In practice, this line is not easily drawn, but the rule serves the useful purpose of allowing the defendant "to present reasonably

> clear-cut proof . . . of limited scope [that has] some
> reasonable chance of negating a showing of probable
> cause," while preventing the extradition proceedings
> from becoming "a dress rehearsal trial." *Koskotas*, 931
> F.2d at 175 (internal quotation marks omitted).

*Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006); *see also Noeller v. Wojdylo*, 922

F.3d 797, 807 (7th Cir. 2019) (stating fugitive "cannot offer contradictory evidence

but only explanatory evidence, described as evidence that explains away or

completely obliterates probable cause. Evidence that contradicts the demanding

country's proof or poses questions of credibility—i.e., contradictory evidence—is

off-limits.") (internal quotation marks and citations omitted)); *In re Extradition*

*of Garcia*, 825 F. Supp. 2d 810, 829 (S.D. Tex. 2011) ("The distinction between

'contradictory evidence' and 'explanatory evidence' is difficult to articulate.

However, the purpose behind the rule is reasonably clear. In admitting

'explanatory evidence,' the intention is to afford an accused person the opportunity

to present reasonably clear-cut proof which would be of limited scope and have

some reasonable chance of negating a showing of probable cause." (citing *In re*

*Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978))).

        In determining that Risner's evidence was inadmissible, the Extradition

Court stated:

> [T]his evidence falls outside the scope of what the Court
> may consider at an extradition hearing . . . . While this
> evidence may be helpful to him in a proceeding to
> collaterally attack his Colombian conviction (in
> Colombia), it is outside the scope of this proceeding. That
> is, to fully consider his evidence – including that torture

> was used to obtain testimony against him; that his sister-in-law's husband considered Mr. Risner to be his sworn enemy and worked to promote Mr. Risner's prosecution; and that his sister-in-law has now recanted her prior testimony, all offered through the testimony of his private investigator – would impermissibly turn this proceeding into a trial on his guilt or innocence. *See Noeller*, 922 F.3d at 803-04 [(parenthetical omitted)].
>
> ***
>
> And, to reiterate, the conclusion that Mr. Risner's evidence falls outside "[t]he range of evidence that a defendant may introduce as to probable cause at an extradition hearing" because his evidence is not "'explanatory evidence,' which entirely eliminates probable cause," *Hoxha*, 465 F.3d at 561, not only applies to each example discussed in detail above but also to all evidence Mr. Risner has presented, *see, e.g.*, Dkt. No. 69 at 14-21 (summary chart).

*Risner*, No. 3:18-mj-765-BN, Mem. Op. & Order 35, 41.

Risner has not explained what alleged errors the Extradition Court made in rejecting this evidence and has cited no support for a finding that the Extradition Court committed error. Further, this Court finds there was enough evidence for the Extradition Court to find probable cause to believe that Risner is guilty of murder. Risner's conclusory allegations that the Court erred are insufficient to entitle him to relief.

4.    Attorney General Barr and Secretary of State Pompeo are not proper parties to this action.

Risner names Attorney General William Barr, Secretary of State Mike Pompeo, and Mansfield Law Enforcement Center Chief of Jail Gary Fowler as

Respondents. Respondents argue that Attorney General Barr and Secretary of State Pompeo should be dismissed from this action because the only proper party in a petition under § 2241 is the petitioner's custodian. The Supreme Court has stated, "[t]he federal habeas statute straightforwardly provides that the proper respondent to a habeas petition is 'the person who has custody over the petitioner.'" *Rumsfeld v. Padillia*, 542 U.S. 426, 434 (2004) (brackets omitted) (quoting 28 U.S.C. § 2242; citing 28 U.S.C. § 2243). "[T]he default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory officials." *Id*. at 435 (citations omitted). Here, Risner states he was incarcerated in the Mansfield Law Enforcement Center at the time he filed his petition. Pet. 1. The Court, therefore, finds that Attorney General Barr and Secretary of State Pompeo are not proper respondents in this action, and Risner's petition against them should be dismissed.

### III.

For the foregoing reasons, the Court should DENY the petition with respect to Mansfield Law Enforcement Center Chief of Jail Gary Fowler and DISMISS the petition with respect to Attorney General William Barr and Secretary of State Mike Pompeo.

**SO RECOMMENDED.**

May 18, 2020.

_____

REBECCA RUTHERFORD
UNITED STATES MAGISTRATE JUDGE

23

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).

24